MILLER v. RAILROAD.

(Filed March 12, 1901.)

1. RAILROADS—*Negligence—Contributory Negligence — Questions for Court.*

Where there is no conflict in the evidence, the question of contributory negligence is for the Court.

2. RAILROADS—*Negligence—Contributory Negligence.*

A person who, seeing an engine standing near a crossing letting off steam in the usual manner, drives across in front of it, can not recover for personal injuries caused by his horse becoming frightened and running away.

ACTION by W. W. Miller against the Wilmington and Powelsville Railroad Company, heard by Judge *A. L. Coble* and a jury, at September Term, 1900, of BERTIE County Superior Court. From a judgment for the plaintiff, the defendant appealed.

*B. B. Winborne* and *St. Leon Scull,* for the plaintiff.
*F. D. Winston* and *R. B. Peebles,* for the defendant.

COOK, J.    After introduction of plaintiff's evidence, the defendant moved for judgment as in case of nonsuit under the statute, Acts 1897, chap. 109, as amended by Acts 1899, chap. 131; motion refused and defendant excepted. Then defendant introduced its evidence, and after all the evidence was in renewed its motion, which was again refused and defendant again excepted. There was a verdict and judgment for plaintiff, and defendant appealed.

The contention of plaintiff is that he was injured by the negligence of defendant in its reckless and careless handling of its engine and train of cars, at or near the town of Windsor, in that defendant unnecessarily obstructed the public

highway, crossing defendant's track, for an unreasonable length of time by allowing its train to remain thereon, and carelessly allowing steam to escape, causing such noises as frightened his horse and unreasonably interfered with the rights of the plaintiff and general public, by reason of which his horse became frightened and ran away with him, throwing him from his buggy and doing him serious injury, causing him much pain to his great damage, etc.

The defendant denies the same, and avers that the injury, if any, was caused by negligence in the careless driving of a wild horse by the plaintiff himself, and that it was not responsible for the same.

It appears from all the evidence (there being no material discrepancy in the testimony of the witnesses) that the first question presented for the decision of the Court is as to the *negligence* of the defendant; so that if the Court shall be of the opinion that the injury was caused other than by the defendant's negligence, then it will be unnecessary to consider the defendant's other exceptions.

"When the facts are agreed upon, or otherwise appear, *what* is ordinary care is a question of law for the Court; when the facts are in dispute, it is the duty of the trial Judge to explain what would be ordinary care under certain hypotheses as to facts, and leave the jury to apply the law to the facts as it may find them. In the case at bar the undisputed facts appear in the evidence, so that *what* constitutes negligence or contributory negligence is a question of law to be decided by the Court, and should not be left to the jury." *Smith v. Railroad,* 64 N. C., 258; *Wallace v. Railroad,* 98 N. C., 494.

In *Pleasants v. Railroad,* 95 N. C., 195, MERRIMON, J., delivering the opinion of the Court, says: "The counsel for the appellant on the argument insisted that the Court ought to have submitted to the jury the question whether or not the

plaintiff used due diligence, or, to state it more definitely and appropriately, whether what the plaintiff did or failed to do was material, as shown by the evidence, constitute negligence or contributory negligence on his part. We think the Court ought not to have submitted such a question. It is not the province of the jury to decide such question. In this State, what constitutes negligence or reasonable diligence is a question of law to be decided by the Court. The facts appearing, the Court decides that there is or is not negligence or there was or was not due diligence." *Herring v. Railroad,* 32 N. C., 402; *Beles v. Holmes,* 33 N. C., 16; *Heathcock v. Pennington, Ibid,* 640; *Avery v. Sexton,* 35 N. C., 247; *Smith v. Railroad,* 64 N. C., 238; *Anderson v. Steamboat Co., Ibid,* 397."

Upon the close of plaintiff's evidence, the defendant admitted it to be true and moved for judgment as of nonsuit; and then, after defendant's evidence was concluded, the motion was renewed. The evidence offered by defendants does not contradict the plaintiff's in any material particular. So the question is one of law. Taking all the evidence of the plaintiff to be true, does it amount to negligence upon the part of the defendant? Or taking *all* the evidence submitted, does it establish negligence? The evidence bearing upon the question is as follows:

Oscar Speller said—

"This year, in winter time, was date of alleged injury. It was near the depot. I was at the blacksmith shop in front of the depot of the defendant company. The engine was standing about three or four steps from the sidewalk. The ditch is next to the street on the edge of the sidewalk. Measuring that in feet it would be nine or twelve feet. The sidewalk is about three or four steps wide. From the inner edge of the sidewalk to the engine was about eight steps. That is, from Turner's shop to the engine was about eight steps.

The entire street from Turner's shop across to the fence is twenty-four steps. There is a sidewalk on one side next to Turner's shop, none the other side. The engine blocked up eight steps of the road. I think about one-third of the road was blocked up. That left the balance for a passway.

"There is grass next to the fence on the side away from the engine, where people don't drive. Between the engine and grass there were three or four steps. One would have to pass very close to the pilot cow-catcher to get by, as near as the distance of a little more than a step, not quite two steps (a step is a yard). I saw plaintiff coming by. I saw him coming down the hill. I had heard of his mare being a trotter. The plaintiff came on and as she got in about two steps of the track, she made a spring and jumped nearly across both the tracks, the side-track and the main line. At the first jump the plaintiff pulled on the reins, and the girth broke, and that pulled the buggy up on her, and she continued to run, and when he turned the corner, he fell out, or jumped out, I don't know which, and the wheel struck him, and knocked him down, and he stayed down. The engine was standing on the side-track on the switch. The engine could have been placed back from the road, could have placed it back as far as they wanted to. I do not know how long the engine had been there. I had been there about half an hour. From the time engine got there until the plaintiff came was ten or fifteen minutes. The engine was standing there when I got there. The engine was making no more noise than usual. The steam was escaping from the safety valve and cylinder cocks. There was not much smoke. The escape of steam from safety valves is a sort of stewing noise like it usually does when steam is up. I do not know what frightened the horse, but from my judgment she got scared of the engine."

### CROSS-EXAMINATION.

"There was plenty of room to pass. A gentle horse, not being afraid of the engine, there was plenty of room for him to pass. She was trotting along a slow gait. There were about four steps clear of the grass. He could have driven out on the grass. Two buggies could have passed, by one driving in the ditch. There were twenty-four steps from one sidewalk to the other. Take eight steps from twenty-four leaves sixteen steps.

"When plaintiff came along he could see the engine as well as I could. I don't think there would have been any trouble if the girth had not broken. I don't know which track the engine was on. It was the freight train. There was nothing unusual about the engine. No whistle blew. Nothing but the noise made by escaping steam as it always makes. All engines make noise when they get steam on them. The warehouse is next to the side-track—the switch. The plaintiff used to be a rapid man with a horse. He used to drive mighty fast."

W. W. Miller, plaintiff, testified:

"On the second of January, early in the morning, after I passed engine, it blew off, and horse run, and harness broke. After I found the harness broke I had no way to do but to make my escape. I knew if I didn't get out I would be thrown out as it turned the corner. If I hadn't got out I would have been thrown out. I had driven this horse by there the Wednesday evening before. That time the engine was from the road about thirty steps, and she didn't show fright. I had passed three times with the engine there. The engine popped off was the reason my horse took fright. She would not have run but for that locomotive standing there popping off. My horse got frightened as near the en-

gine as to post (pointed by him some twenty feet) in about twenty feet of the engine. I was right against the engine side of it when the horse jumped. She went quietly till she got side of the engine and it popped of and frightened her. I was holding the reins as tight as possible. I didn't know whether the horse was gentle. I had just had her one week, and had driven her four or five times, and she showed no attempt to run."

### CROSS-EXAMINATION.

"Robert Burden did not say anything to me about the harness, when I bought the horse. Fred Dunstan did not tell me she was a dangerous horse. There was plenty of room to drive by going close. I thought I could drive by without any trouble. I jumped out of the buggy because I thought I was going to be thrown out, and be hurt. If the girth had not broke I thought I could have held her; I think now that I could. I do not mean to say that they blew the whistle of the engine. The steam was escaping out of the steam-cocks, was what I meant by popping off. I don't know whether the place where they were standing was the place they usually put off and take on freight or not.

"I thought my harness was a right good driving harness."

James Bond testified:

"Just as the mare crossed the track she jumped and ran. I thought the escaping steam frightened her. The plaintiff told me that after the girth broke he was afraid to sit in the buggy any longer, said he was afraid she'd kick. She was going a right good gait as she crossed the track, she was running as long as I saw her. After the girth broke I think I would have done the same thing as plaintiff did; any prudent man would have done the same as plaintiff did after the

girth broke. The ankle was very much swollen when I saw him at the Doctor's office, and he seemed to be suffering great pain."

### CROSS-EXAMINATION.

"I felt certain that the mare would run away and throw him out when she started to run."

Don't you know that the plaintiff is a reckless driver of horses?

(The plaintiff objected. Objection sustained, and defendant excepted. First exception.)

### EVIDENCE OF THE DEFENDANT.

Whit Lawrence testified:

"I am one of the engineers of the defendant company. I remember the morning when the plaintiff's horse passed and ran away. The engine and cars had pulled up there from the river for the conductor to get bills and orders, and for the purpose of passengers getting on the train. I saw the horse after the plaintiff was out of the buggy, and the engine up to that time had not been standing there over four minutes. I was sitting on the right-hand seat when the engine pulled up and had gotten off to oil up. The business of the company on this return trip did not require the engine to remain there over five or ten minutes. When plaintiff's horse passed, there had not been time to attend to the business of the company. We did not remain there that morning any longer than was necessary to attend to the business of the company. The steam was escaping from the cylinder cocks. The whistle was not blown. It is not safe to have an engine which does not permit the escape of steam through the safety valves and cylinder cocks. It is dangerous to have one that does not permit this.

### CROSS-EXAMINATION.

"There was not room for the engine to stand without coming out there for the passengers to get on. We could have cut the train in two, and pulled across the road and kept the engine out of the highway; we were on the main track. We could not have cut the train in two without delaying the work, but it could have been done. I don't remember how many freight cars there were. I could have stopped, so far as oiling the machinery went, before we reached the road. When the engine is stopped the cylinder is always reversed; it could be shut off for a little while, but it is not safe. There is danger of bursting the cylinder heads out. The lower the steam the greater the condensation. It would not have taken but two or three minutes to have backed and recoupled if they had placed part of the train across the road."

### RE-DIRECT EXAMINATION.

"If the engine had been on the other track, it would have been as near the street as it was. We had not had time to cut the engine loose, and to have gone further up the track when the plaintiff passed. We did not intend to do it."

Ed. Davis testified:

"I have been a fireman for the defendant company for some time. I was on the engine when Mr. Miller passed. We had been to the river getting coal. We had been to the depot not over three minutes when plaintiff passed. We had stopped for the conductor to get his freight bills, and to oil the engine, and for the passengers to get on. This work had not been finished when plaintiff drove up. We had not been there long enough when he drove up to have cut the train in two. He was in ten or fifteen feet of the track when I first saw him. He was pulling back on her. When she

got to the railroad she jumped and ran. No whistle blowed, no bell was ringing, the engine was making a sizzling noise."

### CROSS-EXAMINATION.

"They could have cut the train loose, and run the engine across the road. They have done this several times when they blocked the road and people came along. That morning they did not intend to stay there long enough to cut the train loose. It was necessary for them to pull the train up there for passengers to get on. For the conductor to get his way-bills, he could have stopped before he got there and walked up. The engineer could have oiled his engine before he got there by losing time. The train was not running on any schedule. There was no danger of running into any other train by a few minutes delay."

### RE-DIRECT.

"The train was standing at the regular place for passengers to get on, at the regular depot. They had to get to Ahoskie in time for the afternoon train, and this required them to hurry."

H. T. Waters testified:

"I was the conductor in charge of that train. It had a time for passing a point where the Norfolk and Carolina train went to their sand-pit. I remember the occurrence. We had been at the depot not to exceed three minutes. I first saw the plaintiff before he reached the track. His horse seemed frightened and the plaintiff forced his horse across the track, and the girth broke, and the horse ran, and plaintiff jumped from his buggy. We had not been at the depot long enough to transact the company's business when the plaintiff passed. The engine was making no unusual noise.

The escaping of the steam from the safety valve is necessary. When the plaintiff got there, we had not been there long enough to cut the engine loose. It depends upon the coupling as to the time it takes to cut the engine loose. We had the best coupling we could get. We were at the regular depot."

### CROSS-EXAMINATION.

"If we had narrow gauged cars altogether we could have gotten out of the way, but we had both. It was not necessary to stop in the street to get my way-bills. They could have stopped before getting to the street to oil the engine."

### RE-DIRECT.

"It was necessary to stop there to get passengers, or have them walk in muddy places down the track away from the depot."

James C. Gurley testified:

"I was assistant agent of the company. The train had just pulled up and I went in to get the seals to put on the cars, and while I was in the house the plaintiff passed. When the plaintiff passed I would say the train had not been there two minutes. That was the regular place for receiving passengers. The train has a passenger coach."

J. L. Coletrain testified:

"I was at the time depot agent. I remember this occasion. I was in the office when the train came up. Mr. Waters, conductor, came from the train to the platform, and asked for his bills, and as he turned to leave, I heard him say the horse was frightened. This was the usual place for the train to be."

Robert Burden testified:

"I owned this horse at one time; I sold this horse to plain-

tiff; I told him she was gentle enough for a man to drive. Something was broken about the harness when I sold him the mare, and I told him he had better put better harness on her. I had known the horse about two years."

On cross-examination, plaintiff says on day he sold Miller the horse, Miller was driving a double team and using a double set of harness, and don't know what harness he had on day of accident.

Defendant closed.

### EVIDENCE FOR PLAINTIFF.

Hannah Gillam testified:

"I remember the day the plaintiff's horse ran away. The train had been standing in the edge of the road. I don't know how long the train had been standing there when plaintiff's horse came along. After the train came, I went across the street and got a bucket of water, and train was still standing there before plaintiff came along. Not very far across the street to get water. I had been in, and put the bucket up, and went back to the door, when the plaintiff came along. I had not seen the train before I went out to get the water. I think it was about ten minutes from the time I went to get the water and take it back and go to the door."

James Bond recalled:

"The train obstructed at least one-third of the road. No one could have passed right by the blacksmith shop."

### CROSS-EXAMINATION.

"In saying one-third of the road taken up, means that sidewalk is included."

This evidence clearly shows that the defendant was oper-
ating its train in the usual manner and with proper care.
Its train was stopped temporarily at one of defendant's sta-
tions; the crew were engaged in billing freight, sealing
cars, oiling the engine, etc.; the conductor had put the train
in such a place that the passengers could get aboard without
having to pass through muddy places.   In so placing the
train, the engine stood, in part, upon the road, or street cross-
ing the railroad track, but leaving ample room for travelers
to pass.   The engine was under steam, making only the
noises necessarily incident to its use.   As applicable to this
state of facts, it is held "that a traveler, who, seeing an
engine standing near a crossing, letting off steam in the usual
manner, drives across in front of it, can not recover for
personal injuries caused by his horse becoming frightened
and running away."    Elliott Roads and Streets (2d Ed.),
798.    And in *Morgan v. R. Co.,* 98 N. C., 247, MERRIMON,
J., delivering the opinion, says: "The noises ordinarily,
naturally, incident to this work when done where it may
lawfully be done, do not constitute negligence or a nuisance.
Railroads are lawful things, useful and highly important in
the well-being and prosperity of society, and must be toler-
ated and encouraged, notwithstanding the annoying and fear-
ful noises sometimes naturally incident to their use in par-
ticular places that frighten horses and other animals, and
thus occasion accident and injury to individuals.   Harm
thus sustained is *damnum absque injuria.*"

While the evidence shows positively that the occupancy
by the train of that part of the track at the crossing was
necessary, and only for a reasonable time, yet that was of no
concern to the plaintiff on this occasion; for he neither knew
when it came nor when it was expected to leave.   Down the
hill he came driving his trotter.   He saw the condition as it

existed.  It was his duty to have used his ears in hearing as well as his eyes in seeing.  But he did not even stop, nor acquaint the defendant's servants of his presence, nor did he choose to inquire as to the length of time the train would remain, nor request the removal of the engine out of his way. He had every opportunity necessary for his safety, but he did not deem it fit to avail himself of it.  Seeing the engine under steam, hearing the "popping" and "sizzing" of the escaping steam, he assumed the risk; inspired by his confidence in the integrity of his horse, based upon his recent experience with her around the train, he urged her forward; she became frightened—jumped—the insecure girth broke, and off she ran, carrying her unwilling driver at such a rate of speed that he too took fright, and then the frightened two separated, paying but little attention to the order in which it was accomplished, resulting in leaving the plaintiff in pain upon the ground, recalling to mind the wisdom and truth of the Psalmist in saying that "An horse is a vain thing for safety."

Under no aspect of the case do we discover a scintilla of evidence showing negligence on the part of the defendant.

There is error.